**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| BRADLEY K.B.,[1]<br><br>Plaintiff,<br><br>v.<br><br>FRANK BISIGNANO,[2]<br>Commissioner of Social Security,<br><br>Defendant. | Case No. 2:24-cv-10702-MAA<br><br>**MEMORANDUM DECISION AND ORDER REVERSING DECISION OF THE COMMISSIONER AND REMANDING FOR FURTHER ADMINISTRATIVE PROCEEDINGS** |

## I.      INTRODUCTION

On December 12, 2024, Plaintiff Bradley K.B. ("Plaintiff") filed a Complaint seeking review of Defendant Commissioner of Social Security's ("Commissioner" or "Defendant") final decision denying his application for disability insurance benefits under Title II of the Social Security Act.  (Compl., ECF No. 1.)  Pursuant

---

[1] Plaintiff's name is partially redacted in accordance with Federal Rule of Civil Procedure 5.2(c)(2)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States.

[2] Frank Bisignano became Commissioner of Social Security on May 6, 2025. Under Federal Rule of Civil Procedure 25(d), he is automatically substituted as Defendant in this suit.

to 28 U.S.C. § 636(c), the parties consented to the jurisdiction of a United States Magistrate Judge.  (ECF Nos. 8, 9.)  On February 13, 2025, Defendant filed an Answer (Ans., ECF No. 11) and Certified Administrative Record ("AR," ECF Nos. 11-1–11-12).  On March 19, 2025, Plaintiff filed a Brief.  (Pl.'s Br., ECF No. 14.)  On April 9, 2025, Defendant filed a Response Brief.  (Def.'s Br., ECF No. 16.)  On April 22, 2025, Plaintiff filed a Reply Brief.  (Pl.'s Reply Br., ECF No. 17.)  This matter is fully briefed and ready for decision.

The Court deems the matter appropriate for resolution without oral argument. *See* Fed. R. Civ. P. 78(b); C.D. Cal. L.R. 7-15.  For the reasons discussed below, the Court reverses the decision of the Commissioner and remands the matter for further administrative proceedings.

## II.      SUMMARY OF ADMINISTRATIVE PROCEEDINGS

On November 15, 2022, Plaintiff filed a Title II application for a period of disability and disability insurance benefits, alleging disability beginning October 23, 2021.  (AR 236–37.)[3]  The Commissioner denied this claim initially on March 14, 2023 and upon reconsideration on February 9, 2024.  (AR 113–123.)  On March 8, 2024, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (AR 129–30.)  ALJ D. Coburn conducted a telephonic hearing on September 18, 2024, at which Plaintiff and vocational expert Jeff Komar testified.  (AR 34–62.)  On October 4, 2024, ALJ Coburn issued a decision finding Plaintiff was not disabled after making the following findings under the Commissioner's five-step evaluation.  (AR 17–28.)

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since October 21, 2021, the alleged onset date.  (AR 19 ¶ 2.)  At

---

[3] Citations to the Administrative Record are to the AR number.  Pinpoint citations to other docketed documents are to the page numbers in the CM/ECF-generated headers.

step two, the ALJ found that Plaintiff had the following severe impairments:  post-traumatic stress disorder (PTSD) and anxiety disorder.  (*Id.* at ¶ 3.)  At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the agency's listed impairments.  (AR 21 ¶ 4.)  Next, the ALJ found that Plaintiff had the following Residual Functional Capacity ("RFC"):

> [T]he claimant has the residual functional capacity to perform full range of work at all exertional levels but with the following nonexertional limitations: he can perform simple and routine tasks; he can make simple work-related decisions; and he can have occasional contact with supervisors, coworkers, and the general public.

(AR 23 ¶ 5.)

At step four, the ALJ found that Plaintiff was unable to perform any past relevant work.  (AR 26 ¶ 6.)  Finally, at step five, the ALJ found that "there are jobs that exist in significant numbers in the national economy that the claimant can perform," and therefore concluded Plaintiff had "not been under a disability, as defined by the Social Security Act, from October 21, 2021," the alleged onset date, through October 4, 2024, the date of the ALJ's decision.  (AR 27–28.)

Plaintiff appealed, but the Appeals Council denied the request for review on October 28, 2024.  (AR 1–6.)  Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner.  *See* 42 U.S.C. § 405(g).

## III.    STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), the Court reviews the Commissioner's final decision to determine whether the Commissioner's "decision to deny benefits . . . 'is not supported by substantial evidence or is based on legal error.'"  *Treichler v.*

*Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014) (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)). "'Substantial evidence' means more than a mere scintilla, but less than a preponderance; it is such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)); *see also Richardson v. Perales*, 402 U.S. 389, 401 (1971). The Court "must consider the record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." *Garrison v. Colvin*, 759 F.3d 995, 1009 (9th Cir. 2014) (quoting *Lingenfelter*, 504 F.3d at 1035). "'Where evidence is susceptible to more than one rational interpretation,' the ALJ's decision should be upheld." *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) (quoting *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005)). "If the evidence can support either affirming or reversing the ALJ's conclusion, [a court] may not substitute [its] judgment for that of the ALJ." *Robbins*, 466 F.3d at 882.

## IV.   DISCUSSION

### A.   Disputed Issue

The single disputed issue is whether the ALJ committed reversible error by failing to articulate specific, clear, and convincing reasons for rejecting plaintiff's subjective symptom testimony. (Pl.'s Br. 4.[4])

### B.   Applicable Law

When assessing a claimant's credibility regarding subjective symptom testimony or allegations, the ALJ must engage in a two-step analysis. *Trevizo v.*

---

[4] Except for citations to the Administrative Record, pinpoint citations to docketed documents refer to the page numbers in the CM/ECF-generated headers.

*Berryhill*, 871 F.3d 664, 678 (9th Cir. 2017). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Garrison*, 759 F.3d at 1014 (quoting *Lingenfelter*, 504 F.3d at 1035–36). "In this analysis, the claimant is not required to show 'that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom.'" *Id.* (quoting *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996)). "Nor must a claimant produce 'objective medical evidence of the pain or fatigue itself, or the severity thereof.'" *Id.* (quoting *Smolen*, 80 F.3d at 1282).

If the claimant satisfies this first step, and there is no evidence of malingering, the ALJ must provide specific, clear and convincing reasons for rejecting the claimant's testimony about the symptom severity. *Id.* at 1014–15; *see also Robbins*, 466 F.3d at 883 ("[U]nless an ALJ makes a finding of malingering based on affirmative evidence thereof, he or she may only find an applicant not credible by making specific findings as to credibility and stating clear and convincing reasons for each."). "This is not an easy requirement to meet: 'The clear and convincing standard is the most demanding required in Social Security cases.'" *Garrison*, 759 F.3d at 1015 (quoting *Moore v. Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)). The ALJ must evaluate "the intensity and persistence of those symptoms to determine the extent to which the symptoms limit [the claimant's] ability to perform work-related activities for an adult . . . ." Social Security Ruling 16-3p, 2016 SSR LEXIS 4, at *4 (Mar. 16, 2016).

While the ALJ cannot "delve into wide-ranging scrutiny of the claimant's character and apparent truthfulness," *Trevizo*, 871 F.3d at 678 n.5, the ALJ may consider "prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; . . . unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of

treatment; and . . . the claimant's daily activities," *Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014) (quoting *Smolen*, 80 F.3d at 1284). Inconsistencies between a claimant's testimony and conduct, or internal contradictions in the claimant's testimony, also may be relevant. *Burrell v. Colvin*, 775 F.3d 1133, 1137–38 (9th Cir. 2014). In addition, the ALJ may consider "the claimant's work record and observations of treating and examining physicians and other third parties regarding, among other matters, the nature, onset, duration, and frequency of the claimant's symptom; precipitating and aggravating factors; [and] functional restrictions caused by the symptoms . . . ." *Smolen*, 80 F.3d at 1284. However, it is improper for an ALJ to reject subjective testimony based "'solely on a lack of objective medical evidence to fully corroborate' the claimant's allegations." *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1227 (9th Cir. 2009) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 345 (9th Cir. 1991)).

The ALJ must make "a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (quoting *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002)); *see Brown-Hunter v. Colvin*, 806 F.3d 487, 493 (9th Cir. 2015) ("A finding that a claimant's testimony is not credible 'must be sufficiently specific to allow a reviewing court to conclude the adjudicator rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit a claimant's testimony regarding pain.'" (quoting *Bunnell*, 947 F.2d at 345–46)). Although an ALJ's interpretation of a claimant's testimony may not be the only reasonable one, if it is supported by substantial evidence, "it is not [the court's] role to second-guess it." *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001).

///

///

///

6

### C.    Plaintiff's Statements

On September 18, 2024, Plaintiff testified before the ALJ in part as follows:

He last worked for his former company in October 2021, then was terminated from that position in December 2021.  (AR 39.)  He started his own business, but never made any money, and his health problems took a turn for the worse, so he ceased working entirely in November 2022.  (AR 39.)

His problems date back to his time with his former company.  (AR 40.)  He submitted an HR complaint in October 2021 because his boss had been repeatedly threatening him and sexually harassing him.  (AR 40–41.)  He suspected his boss of stealing company data.  (AR 41.)  His boss also tried to coerce him into committing tax fraud and tried to get him to engage in discriminatory hiring practices.  (AR 41.)  His boss tried to shoot him eight to ten times.  (AR 47.)  During a business dinner at a trade show with the man who was harassing him, this man "violently yanked" Plaintiff's chair at least twice.  (AR 41.)  After this incident, Plaintiff had nonstop racing thoughts, insomnia, and a lot of dissociation.  (AR 41.)  Plaintiff submitted an HR complaint to the president of the company, which was Italian.  (AR 41.)  He then had two meetings with the president, as well as an attorney and a psychologist who were Italian citizens and whom Plaintiff felt "acted in a manner . . . designed to intimidate [him], like they were a part of, associated with, or working with the Italian mafia."  (AR 41.)  After that meeting Plaintiff thought he was going to get shot in the head.  (AR 41.)  The company conducted an investigation, and then Plaintiff was terminated.  (AR 41–42.)  Plaintiff "had also been working with the police," but they decided at the last minute not to arrest Plaintiff's harasser, as Plaintiff had anticipated.  (AR 42.)

Plaintiff started seeing a psychologist in January 2022, who diagnosed him with PTSD.  (AR 42.)  Plaintiff had nonstop racing thoughts, insomnia, sleep disturbances, and "nonstop dissociation to the point where [he] just quit watching TV shows and movies."  (AR 42.)  He becomes fatigued and needs to rest if he does

work on a computer. (AR 42.) He can also become irritable and miserable if he has done several hours of semi-complex work on a computer. (AR 42–43.) He also has back pain from the incident at the business dinner when his boss yanked his chair. (AR 43.) After his interactions with the police and HR, Plaintiff "lost faith in institutions," which caused him to delay going to the doctor for treatment for his back, though he did go eventually. (AR 43.)

His back continues to hurt, and it can be triggered by sitting at a computer for more than two or three hours or being in a car for 45 minutes to an hour. (AR 43–44.) He also has problems with memory loss and complex problem-solving and feels overwhelmed by minor tasks. (AR 44.)

He threw himself into starting his own company, but his insomnia prevented him from getting much done. (AR 44.) He was "retriggered" during a deposition and started hating his own company, which became a PTSD trigger. (AR 44.) He tried looking for work and applied to at least 600–800 jobs, but eventually realized he was not capable of working like he used to. (AR 45, 49.) He gets distracted from whatever he is trying to do by thoughts of the traumatic experiences he went through with his former boss. (AR 45.) He hired a psychologist to do a threat assessment on his former boss because he believed himself to be in danger. (AR 46.) He found the fact that his former boss had tried to shoot him and was romantically obsessed with him to be severely disturbing. (AR 47.)

His former company is located in Texas, where Plaintiff lived for some of the time he worked for that company. (AR 48.) Plaintiff moved back to California in October 2020. (AR 48.) His boss once threatened to follow him to California. (AR 49.) Out of all the jobs he applied for, he got a lot of interviews, but only one offer. (AR 49.) It was a sales job requiring a lot of driving, and Plaintiff "decided not to waste their time" because of his back pain and all his other health issues. (AR 49.) Also, about the time he got that offer, his health took a turn for the worse. (AR 49–

///

50.)  He may have gotten another job offer to work at home doing IT tech support, but does not really remember.  (AR 53.)

Plaintiff lives in an apartment with no roommates or pets.  (AR 50.)  He no longer has a car and gets what he needs from Amazon or walks 5 minutes to Rite Aid.  (AR 50.)  He has social anxiety and has not been around large groups of people in a long time.  (AR 50–51.)  He does not visit with friends or family.  (AR 51.)  He stopped psychotherapy because it was not helping anymore.  (AR 52.)  He has concerns about driving when he has not slept.  (AR 52.)

He spends much of his time exercising:  about two and a half to three hours a day four days a week, and about one to two hours a day two days a week.  (AR 54.)  Otherwise, he often lies on the sofa and does nothing at all.  (AR 54.)

> I'm not on the computer during the day for more than a few hours, very, very, very like.  If not for sure my back's going to hurt in the evening and I will take ibuprofen.  I don't like taking ibuprofen, so I usually just suffer, so I just avoid the computer during the day.  So mostly exercising and sometimes watching TV.  But for the most part, I just exercise and listen to music and maybe watch TV in the afternoon, and I'll just lay on the sofa.

(AR 54.)  When asked if he still played videogames, he stated:

> It's not the same for me even playing games.  I get anxiety and I get – they can get me wound up and get me to dissociate, too.  So, I do play games sometimes and sometimes I you know, it's the only time I can forget about the situation sometimes.  But I only really play those in the evening, and I don't do them like I used to, you know, I go sometimes weeks at a time not playing them.  I go months and months not playing any games since the fall happened.

///

///

9

(AR 54–55.)  He does not belong to a gym and works out entirely at home.  (AR 55.)  He lifts weights, and does cardio and "some boxing" inside his apartment. (AR 55.)  He used to run, but stopped leaving his house:

> I stopped around maybe March of this year.  I just got tired of it.  I used to run for a very long time and very, very long periods when I had not wanted to leave the house at all and that started right after I got attacked at that business dinner.  And so, if some – for whatever reason, back in March of this year, I just got tired leaving the house and I didn't leave the house very much for a very long time.  I just started going on walks in the afternoon a couple weeks ago and then in March I stopped, maybe April, early April/March.

(AR 55.)  He is also involved in a lawsuit against his former employer.  (AR 55–56.)

When Plaintiff was asked whether he had ever been recommended for psychotropic medication therapy, he responded:

> I told Dr. Lynch early on that that wasn't a road I wanted to go down and, you know, I do have antianxiety medicine, Klonopin, you know, during my employment around November 2021, they gave me ten pills and I still have five.  Dr. Lynch, you know, I think he didn't – there's a lot of concern with me taking that medicine and using it, and I don't know if his concerns were specific toward me.  I don't think so (INAUDIBLE) at night.  But I have that for emergencies.  But other than that, you know, personally, I think I probably made a mistake not taking antidepressants –
>
> *  *  *
>
> You know, I just wanted to – I wanted to be awake every day and eat healthy and go to bed and, you know, not drink alcohol and prove Dr. Lynch wrong.  And, you know, I don't regret doing all those things, but I think

10

that the second psychologist I spoke with (INAUDIBLE) I don't want to do that.

(AR 57.)

With respect to his back pain, Plaintiff stated that his doctor had not recommended surgery, and gave him exercises to do, which he does pretty often. (AR 57.)  "And other than that, I just try to avoid triggering it, you know, not being on a computer for a long time during the day. I thought maybe running might be triggering it, so I don't do that anymore. So, that's it."  (AR 58.)

### D.   Analysis

At the first step of the two-step evaluation, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms."  (AR 24.)  At the second step, however, the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision."  (*Id*.)  As the ALJ found no evidence of malingering, the ALJ was required to provide specific, clear and convincing reasons for rejecting Plaintiff's subjective symptom statements.  *See Garrison*, 759 F.3d at 1014–15.

The Court may review only those reasons that the ALJ specifically cited as grounds to reject Plaintiff's subjective symptom testimony.  *See Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003) ("We are constrained to review the reasons the ALJ asserts."); *Garrison*, 759 F.3d at 1010 ("We review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely.").  Here, the ALJ provided four reasons for discounting Plaintiff's subjective complaints of disabling PTSD symptoms, finding that his complaints were inconsistent with: (1) his admitted activities, (2) the ALJ's personal observations of Plaintiff during the hearing, (3) the

11

objective medical evidence, and (4) conservative treatment.  (AR 24–25.)  The
Court reviews each reason in turn.


        a.      *Activities of Daily*

One of the reasons the ALJ gave for discounting Plaintiff's statements
regarding his symptoms was Plaintiff's ability to engage in various activities.  (AR
24.)  An ALJ may consider activities of daily living in evaluating the intensity,
persistence, and limiting effects of a claimant's symptoms.  20 C.F.R.
§§ 404.1529(c)(3), 416.929(c)(3).  "Inconsistencies between a claimant's testimony
and the claimant's reported activities provide a valid reason for an adverse
credibility determination."  *Burrell*, 775 F.3d at 1137.  However, "[t]he Social
Security Act does not require that claimants be utterly incapacitated to be eligible for
benefits, and many home activities may not be easily transferable to a work
environment where it might be impossible to rest periodically or take medication."
*Smolen*, 80 F.3d at 1284 n. 7.

Here, the ALJ discounted Plaintiff's testimony as inconsistent with his
activities of daily living, as follows:

> He was able to start his own company, look for
> employment while working, play videogames, submit 90
> job applications, use LinkedIn, exercise, started his own
> company, play games, go to the beach, shop in stores,
> maintain his grooming and hygiene, plan and prepare
> meals, clean, do the laundry, travel on foot, drive, shop
> online, manage his finances, watch television, read,
> email, text, and handle stress and changes in routine
> (Testimony; Exs. 3E; 11F/7, 8; 16F/1, 3, 5).  These
> activities are specifically inconsistent with the claimant's
> subjective complaints about his symptoms and
> limitations.  Accordingly, the undersigned finds that his

///

> activities are inconsistent with the claimant's statements about the intensity and persistence of symptoms.

(AR 24–25.)

However, the ALJ failed to articulate how the specified activities were inconsistent with Plaintiff's allegations about his limitations. Further, simply listing these activities does not reveal the context in which they were actually performed, according to Plaintiff's testimony. For instance, included twice in this list is Plaintiff's ability to start his own company; however, Plaintiff testified that he was unable to make any money and stopped work on it after less than a year, due to his health problems. (AR 39.) His insomnia prevented him from working full days, and the company became "too much for [him]" and became a PTSD trigger. (AR 44.) The ALJ also referenced Plaintiff's ability to play videogames and watch TV, but Plaintiff specifically testified that he had "quit watching TV shows and movies months ago," because he could not concentrate due to intrusive thoughts about his past trauma. (AR 42, 45.) As to videogames, he testified that he does not play them as much as, or like, he used to, as they can trigger his anxiety, and he sometimes goes weeks or months without playing them. (AR 54–55.) As to looking for employment, Plaintiff actually testified that he had submitted more like 600–800 applications (AR 45, 49), but that des not necessarily translate into an ability to obtain, accept, or hold down a job. As described by Plaintiff, these activities were not inconsistent with Plaintiff's alleged degree of limitations. *See Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001) ("[T]he mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability." (citing *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989))); *Ghanim*, 763 F.3d at 1165 ("But here, as described, the daily activities, which included completing basic chores, sometimes with the help of a friend, and attending occasional social events, do not contradict [the claimant's] testimony.").

13

An ALJ may not "improperly cherry-pick[]" evidence. *Ghanim*, 763 F.3d at 1164 (holding that ALJ may not "cherry-pick" evidence that favors disability without considering its context in the record); *see also Garrison*, 759 F.3d at 1017 n.23 ("The ALJ was not permitted to 'cherry-pick' from those mixed results to support a denial of benefits[.]").  For these reasons, the ALJ's rejection of Plaintiff's subjective symptom testimony based on inconsistency with daily activities was not a clear and convincing reason based on substantial evidence in the record.

### b.    *ALJ's Personal Observations*

Another reason the ALJ gave for discounting Plaintiff's statements regarding his symptoms was their inconsistency with the ALJ's personal observations of the Plaintiff during the telephonic hearing.  (AR 25.)  "Although an ALJ's personal observations do not necessarily render a decision improper, the Ninth Circuit has repeatedly condemned so-called 'sit and squirm' jurisprudence." *Thompson v. Colvin*, No. CV 15-9608 AS, 2016 U.S. Dist. LEXIS 123421, at *11 (C.D. Cal. Sept. 12, 2016) (citing *Verduzco v. Apfel*, 188 F.3d 1087, 1090 (9th Cir. 1999); *Perminter v. Heckler*, 765 F.2d 870, 872 (9th Cir. 1985)).  Here, the Court is unpersuaded that the ALJ's observations from Plaintiff's testimony during a fifty-one minute hearing provide sufficient support for an adverse credibility finding. *See Thompson*, 2016 U.S. Dist. LEXIS 123421, at *11 (finding "no difficulty concluding that the ALJ's observations during the fourteen-minute hearing" provided insufficient support for the ALJ's adverse credibility determination); *Agans v. Saul*, No. 2:20-cv-00508 AC, 2021 U.S. Dist. LEXIS 71471, *41 (E.D. Cal. Apr. 12, 2021) (holding that claimant's ability to process and respond to questions during a hearing that lasted less than an hour was not inconsistent with the claimant's symptoms claims).  Accordingly, this was not a clear and convincing reason to reject Plaintiff's subjective symptom allegations.

///

14

Further, the ALJ stated that Plaintiff "did not demonstrate or manifest any difficulty concentrating, understanding, or remembering during the hearing. During questioning, he appeared to process the questions without difficulty, and responded to the questions appropriately and without delay. He also paid attention throughout the hearing." (AR 25.) However, while this Court will not substitute its judgment for the ALJ's personal observations during the telephonic hearing, it must be noted that the written transcript of the hearing does not give the same impression. (*See, e.g.*, AR 53 (Plaintiff does not seem able to remember whether or not he received a job offer for a remote-work job).)

### c.   *Objective Medical Evidence*

Another reason the ALJ gave for discounting Plaintiff's statements regarding his symptoms was that they were inconsistent with the objective medical evidence. (AR 25.) In support of this point, the ALJ states that "the objective findings from the mental status examinations were generally within normal limits," citing solely to progress notes from Plaintiff's treating psychologist, Dr. Timothy Lynch, who met with Plaintiff in regular telehealth sessions from January 11, 2022 through April 19, 2023, sometimes weekly and sometimes every two weeks, with a total of 37 seven sessions during that period. (AR 419–94.) From the pages cited, it appears the ALJ was referencing the "Mental/Functional" section of the notes for each session, which usually described Plaintiff's behavior as calm, his appearance as well-groomed, his speech as "[c]lear, coherent, normal for volume, rate, and prosody," his "[t]hought [p]rocess/content" as "linear, goal directed, unremarkable TC," and with a "Suicidal Risk Assessment" of "Denied SI, HI, AVH." (*E.g.*, AR 487.) However, in the same section of the treatment notes for most of these sessions—all sessions from February 15, 2022 forward—Plaintiff's "[m]ood and [a]ffect" are described as "[d]ysphoric, highly anxious when describing the precipitating/trauma event(s)." (AR 420, 422, 424, 426, 428, 430, 432, 434, 436,

15

438, 440, 442, 445, 446, 448, 451, 453, 455, 457, 458, 460, 462, 464, 466, 479, 481, 483, 485, 487, 489, 491, 493.)  Further, those notes contain other statements documenting Plaintiff's symptoms, such as noting that his depression and anxiety presented as severe (AR 466), physical symptoms including heart beating; tingling; sweating; chest tightness; increased respiration; stomach tension, tightness, and contractions; neck and head stress; elbow and upper arm pain; rib, chest and trapezoid pain; and jaw clinching.  (*See, e.g.*, AR 452, 456, 458, 462, 464.)

It is unquestionably true that an ALJ may consider whether a claimant's subjective symptoms are supported by objective medical evidence, and that an ALJ may reject a claimant's subjective testimony if it is inconsistent with the objective medical evidence.  *See Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1161 (9th Cir. 2008) ("Contradiction with the medical record is a sufficient basis for rejecting the claimant's subjective testimony.").  However, an ALJ cannot "selectively quote[]" a treating physician's notes.  *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001).  Further, the ALJ here also cited the report of Dr. Michelle Conover, who appears to have examined Plaintiff as part of a defense psychological examination in connection with his civil lawsuit against his former employer.  (AR 1001–23.)  Dr. Conover felt the need to hire private security guards to be onsite during Plaintiff's examination.  (AR 1005–06.)  She describes Plaintiff's emotional state as including "severe paranoia, delusion, and dissociation," and therefore recommended that he turn his weapons in to his treating psychologist, Dr. Lynch, whom she noted should "closely monitor [Plaintiff] in order to ensure [his] safety and the safety of others."  (AR 1022.)  She also noted that "a psychiatric referral is warranted and advised given the severity of [Plaintiff's] condition."  (*Id.*)  When "the record contain[s] a mix of normal and abnormal results," the ALJ must "explain why she found the normal ones more persuasive."  *O'Connor v. Berryhill*, 355 F. Supp. 3d 972, 984 (W.D. Wash. 2019).  The fact that some of Plaintiff's records showed some findings "within normal

16

limits," in light of the record as a whole, was not a clear and convincing reason to discount Plaintiff's testimony.

####        d.        *Conservative Treatment*

Another reason the ALJ gave for discounting Plaintiff's statements regarding his symptoms was that they were inconsistent with the extent of treatment sought by Plaintiff.  (AR 25.)  An ALJ may consider a claimant's treatment and medication in evaluating a claimant's symptom testimony.  20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).  "[E]vidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding severity of an impairment."  *Parra v. Astrue*, 481 F.3d 742, 751 (9th Cir. 2007) (citing *Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995)); *see also Tommasetti*, 533 F.3d at 1039–40 (determining that claimant's favorable response to conservative treatment undermined claimant's testimony of disabling pain); *Johnson*, 60 F.3d at 1434 (holding that ALJ properly may rely on the fact that only conservative treatment had been prescribed to reject claimant testimony).  However, "[a]ny evaluation of the aggressiveness of a treatment regimen must take into account the condition being treated."  *Revels v. Berryhill*, 874 F.3d 648, 667 (9th Cir. 2017).

Here, the ALJ stated that the degree of Plaintiff's "subjective complaints [was] not comparable to the extent of treatment sought by [Plaintiff].  In fact, [Plaintiff's] treatment regimen was conservative and the case record is devoid of evidence of persistent attempts to obtain relief symptoms, such as trying a variety of treatments, referrals to specialists, or changing treatment sources.  For instance, he was treated with medications and therapy."  (AR 25.)  The ALJ did not, however, identify any particular treatment that Plaintiff could have, but did not, try.  (*Id.*)  Further, "medication for the treatment of psychiatric disorders is generally not considered to be 'conservative treatment,' and not every disabling impairment requires the claimant be hospitalized."  *Moreno v. Comm'r of SSA*, No. CV-22-

00319-PHX-DLR, 2023 U.S. Dist. LEXIS 134523, at *15 (D. Ariz. Aug. 2, 2023); *see also Gary I. v. Kijakazi*, No. 2:20-CV-07882-GJS, 2022 U.S. Dist. LEXIS 13650, at *5 (C.D. Cal. Jan. 24, 2022) ("Courts have established that medication treatment regimens [for mental impairments] with [prescription] medications are not conservative. . . . Nor must a claimant undergo psychiatric hospitalization to be considered disabled." (citations omitted)).  Accordingly, this was not a clear and convincing reason to reject Plaintiff's subjective symptom allegations.

* * *

In sum, the ALJ's decision does not provide specific, clear, and convincing reasons for rejecting Plaintiff's subjective symptom allegations.  Reversal is warranted.

### E.    Remand for Further Proceedings

The decision whether to remand for further proceedings or order an immediate award of benefits is within the district court's discretion.  *See Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000).  Where no useful purpose would be served by further administrative proceedings, or where the record has been fully developed, it is appropriate to exercise this discretion to direct an immediate award of benefits.  *See id*. at 1179 ("[T]he decision of whether to remand for further proceedings turns upon the likely utility of such proceedings.").  However, where, as here, the circumstances of the case suggest that further administrative review could remedy the Commissioner's errors, remand is appropriate.  *See McLeod v. Astrue*, 640 F.3d 881, 888 (9th Cir. 2011).  Specifically, remand is warranted here for reconsideration of Plaintiff's symptom statements regarding his mental health issues because the ALJ's failure to provide legally sufficient reasons for discounting such statements in the decision prevents this Court from meaningfully determining whether the decision is supported by substantial evidence.  *See Treichler*, 775 F.3d

18

at 1103 ("Because 'the agency's path' cannot 'reasonably be discerned,' we must reverse the district court's decision to the extent it affirmed the ALJ's credibility determination." (citation omitted)).

## V.    ORDER

The Court **ORDERS** that judgment be entered reversing the decision of the Commissioner and remanding this matter for further administrative proceedings.

**IT IS SO ORDERED.**

DATED: March  31, 2026

_____

HONORABLE MARIA A. AUDERO
UNITED STATES MAGISTRATE JUDGE

19